Jasen, J. (dissenting).
I would reverse the order of the Appellate Division and dismiss the motion to amend the judgment. This case presents important questions of law and policy regarding the application of legislation to pending plans for conversion of rental apartments to co-operative and condominium apartments.
Ever since the end of the Second World War, there has been an acute shortage of rental housing for middle-income families in New York City. It was early realized that landlords, in a landlord’s market, could easily exact exorbitant rents and charges from tenants with but limited incomes and no other suitable place to live. The legislative concern for the plight of the middle-income tenant has been evidenced by the enactment of various rent control and rent stabilization laws, both on a State and local level, all designed to protect the tenant from the full free-market pressure that landlords could, and did, assert. The underlying concern is for the economic survival of New York City itself. High city rentals precipitate the flight of the middle class from the city, leaving behind a weakened tax base, unused and deteriorating buildings, and a reduced population consisting only of the few very rich and the many very poor.
Early in this decade, the co-operative and condominium forms of real estate ownership were introduced into the New York City housing market. Landlords, stymied by stringent rent limitation statutes, perceived that they could, by convert *989 ing their existing traditional ownership structures into these comparatively new forms, cast the burden of expense for maintenance and upkeep upon the tenant, while receiving substantial profits on their investment. The history of cooperative and condominium conversions in New York City, in the terms of the ancient adage, proves that the sum value of the parts can be much greater indeed than the value of the whole. The tenant, once again, was faced with an impossible choice. He could purchase his apartment, or the stock in the corporation that owned it, at whatever price the landlord would set. In most instances, this meant a mortgage, with monthly mortgage payments as well as monthly maintenance charges, not to mention continuing liability for assessments to cover special repairs. The resident, in short, would become his own tenant and his own landlord, bearing the costs and responsibilities of both. Alternatively, he could decline to purchase and, thereby, run the risk that someone else would buy his apartment and evict him, from a place he had resided in, peacefully, for many years. An uprooted tenant would have no assurance of again finding comparable housing at an affordable rent within the same neighborhood, or even within the city itself. These harsh consequences, too, were called to the attention of the Legislature, resulting in a statute, since amended, affording tenants significant procedural and substantive protections.
It is within this context, and with this knowledge, that the present appeal should be considered. The facts are starkly simple. The Parkchester Apartments are a large, pre-World War II, multistructure housing development in Bronx County. There are 12,200 rental units in the complex with a total population of 50,000, consisting, for the most part, of middle-income families. Ever since December 1972, the new owner of the development has endeavored to convert the project, in stages, from traditional apartment lease arrangements to condominiums. It filed a plan, which was accepted by the State Attorney-General, to convert Parkchester’s North Quadrant. A tenant challenged the plan and the Attorney-General’s acceptance of it, in an article 78 proceeding. In February 1975, we determined that the tenant had standing to make his challenge, but that applicable statute (General Business Law, § 352-e) required the Attorney-General to determine only whether the offering plan contained the requisite information and not whether the information was, in fact, true and accu *990 rate. (Matter of Whalen v Lefkowitz, 36 NY2d 75.)' While the Whalen case was on appeal, the landlord submitted a plan to convert the other three quadrants of the development. Contending that the standard of review depended upon the resolution of the Whalen case, the Attorney-General refused to consider this plan. This led to a second article 78 proceeding, this time instituted by the landlord. We ultimately held, on February 17, 1975, that the Attorney-General was required to decide the application, despite the existence of a related proceeding. (Matter of Parkchester Apts. Co. v Lefkowitz, 36 NY2d 688.) In the interval, on June 15, 1974, section 352-e of the General Business Law was amended to provide additional tenant protections within the offering plan filing requirements. (L 1974, ch 1021.) By this proceeding, the landlord seeks to have appended to the earlier Parkchester judgment a requirement that the Attorney-General decide its application under the law existing prior to the amendment. Special Term granted petitioner the substantive relief, but did so by converting the motion for an amended judgment into a separate article 78 proceeding. The Appellate Division agreed with Special Term on the merits, but held that conversion was not permissible or even necessary since relief, in its view, could be awarded by simply amending the earlier judgment. (51 AD2d 277.)
I would reverse the order of the Appellate Division and dismiss the motion. Procedurally, there is no authority for amending the earlier judgment to include substantive provisions arising from an issue explicitly not considered on appeal from the judgment. I find no warrant for the conversion of a motion to amend a judgment into a separate article 78 proceeding. Indeed, while such conversion was apparently contemplated by the draftsmen of the CPLR, the Legislature refused to adopt their view. In short, the actions of the courts below are not sustained by any known rule of procedure. Yet there is more here than procedural defects, however fundamental. The resolution of the merits turns solely on issues of fairness and equity. This much has been conceded by the Appellate Division. (51 AD2d, at p 281.) True, the landowner is within the technical letter of the law. But, as is sometimes the case, there is no equity in that. Rather, I submit that the equities lie with the Attorney-General and with the tenants in this development who are now exposed, by the force of the majority’s decision, to much unfairness and to much inequity. *991 The Legislature enacted a remedial statute to protect all tenants from some of the hazards of conversions and stated that the statute should take effect "immediately”. I believe that public policy favors a construction of the statute which takes the Legislature at its word and implements its statute "immediately”. As for the landowner, there is no undue prejudice in having to comply with the law in effect at the time his application was considered and it certainly had no vested right to the law as it existed at the time he made his application.
At the threshold, there is no proper procedural basis to support the award of relief. This aspect of the extensive litigation was commenced by a motion to supplement the judgment directing the Attorney-General to review the landowner’s offering plan. That judgment simply required the Attorney-General "to determine if [the plan] contains the information and representations required by General Business Law § 352-e”. The Attorney-General took an appeal from the judgment and, pending disposition of the appeal, section 352-e of the General Business Law was amended. When the appeal reached our court, we specifically refused to pass on the applicability of the amendment to this case. Indeed, the issue had not even been briefed to our court. "We do not reach the issue tendered on oral argument as to the application in this case of chapter 1021 of the Laws of 1974.” (Matter of Parkchester Apts. Co. v Lefkowitz, 36 NY2d 688, 689, supra.) Nevertheless, the landowner sought, by its motion, to amend the judgment so as to render the statutory revisions inapplicable.
There was no basis for granting the motion. While the court has inherent authority to amend its own judgment to correct clerical mistakes or omissions, it cannot amend the judgment in any substantive respect. (Herpe v Herpe, 225 NY 323, 327-328.) In fact, it has been clearly stated that "the right to amend does not extend to new issues not embraced within the original action”. (9 Carmody-Wait 2d, NY Prac, § 63:158, p 99.) That the amendment requested by the landowner was substantive, there can be little doubt. By granting its motion, as the Appellate Division has done, the landowner’s rights under the original judgment have been greatly enlarged. The original judgment simply required the Attorney-General to review the plan under the provisions of the General Business Law, without specifying whether the law to be applied was fixed irreparably as of the date of the judgment. The Attorney- *992 General was ordered to apply the law, but was not told which law, past or present, to apply. In reviewing the judgment, we refused to pass on this question. Under such circumstances, the landowner should not be permitted to amend the judgment to include new matters of substance not presented on appeal from the judgment. There is no contention that the original judgment was erroneous in any way. While subsequent events rendered its language "ambiguous” to say the least, the ambiguity goes to the very heart of the case. The landowner’s motion did not seek to correct a technical mistake; it sought a favorable resolution of a substantive dispute arising from the very language of the judgment. In my view, the proper procedure was to commence an article 78 proceeding to challenge the Attorney-General’s decision to review the plan under the amended statute. In this context, the landowner could have received judicial consideration for its contention that it was error to apply the amended law.
Nor can the procedural defect be cured simply by converting the landowner’s motion to amend the judgment into an article 78 proceeding. Conversion to a proper form is appropriate only where the court has jurisdiction of the parties and it is a "civil judicial proceeding” that was brought in an improper form. (CPLR 103, subd [c].) Only actions and special proceedings are "civil judicial proceedings”. (CPLR 103, subd [b].) Motions are not. A motion is simply an application for an order. (CPLR 2211.) A motion generally seeks incidental relief, while a special proceeding, though brought on with the same steps that bring on a motion, seeks to obtain full plenary relief, culminating in a judgment. (See Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 2211, C2211:3, pp 29-30.) The Advisory Committee on Practice and Procedure proposed a liberal conversion rule that would have authorized the court to convert to proper form any "application for relief’, including motions. (Third Preliminary Report of the Advisory Committee on Practice and Procedure, Legis Doc No. 17 [1959], p 47.) However, this was rejected by the Legislature as "too broad”. (Fifth Preliminary Report by the Senate Finance Committee, Legis Doc No. 15 [1961], p 20.) Hence, there is no warrant in procedural law to correct the fundamental procedural mistake committed in this case. Most important, it is bad practice to review an administrative determination upon mere motion.
While I am of the opinion that the underlying motion is not *993 the proper vehicle for review of the merits, in view of the majority’s decision to affirm on the Appellate Division opinion, I am obligated to state also my disagreement with the Appellate Division’s view of the merits.
The general rule in our State has been that appellate courts must enforce the statutes as they exist on the date of decision. Thus, if the applicable statute is changed at any time prior to the final determination on appeal, the court must "give effect to” the amended version. (Matter of Broadwalk & Seashore Corp. v Murdock, 286 NY 494, 498; accord Strauss v University of State of N. Y., 2 NY2d 464, app dsmd 355 US 394.) However, a limited exception has been recognized for those situations where a governmental defendant unjustifiably creates the delay during which the statute was changed. Thus, a deliberate and unexplained refusal to act may warrant application of the statute in force at the start of the delay. (Matter of Dubow v Ross, 254 App Div 706.) Recently, we have extended this exception to include negligent, as opposed to willful, delay. In Matter of Our Lady of Good Counsel R. C. Church & School v Ball (45 AD2d 66, affd on opn at App Div 38 NY2d 780), the court observed that "[t]he rule that willful delay by a governmental agency or employee exempts the applicant from the onerous strictures of an amendment of a statute, or of a new statute, is one based on fairness and equity. It would be no less unfair to penalize an innocent and diligent license applicant because delay was due to negligent rather than willful nonfeasance.” (45 AD2d, at p 73 [emphasis added].) The basic question should be whether fairness and equity require a departure from the rule requiring the application of subsequent legislation. Not every delay will warrant such a departure. Most delays will not, else the exceptions would devour the rule. Indeed, in the general run of administrative determinations, a failure to reach the correct decision initially creates a delay not authorized by law.
The mere fact that we have previously ordered the Attorney-General to reach a decision on the present application does not necessarily mean that his delay was so unjustified as to require that his decision be based on repealed and inoperative provisions. Instead, I believe that the question remains whether, in light of the facts and the purposes of the new legislation, considerations of fairness and equity justify a departure from the present statutory standards.
In my view, fairness and equity do not warrant granting *994 Parkchester an exemption from the Legislature’s remedial statute. The Attorney-General’s delay, in contrast to that of the licensing official in the Good Counsel case, was premised on a clearly articulable and reasonable policy determination. Shortly before Parkchester submitted an offering plan for the south, east and west quadrants, Special Term rejected the standard of review that the Attorney-General had applied to the north quadrant. While this conclusion was eventually reversed on appeal, the Attorney-General, in the interim, operated amidst the uncertainty that accompanied a direct challenge to his previously applied standard. His decision to delay acceptance of the offering plan for the other three quadrants reflected a desire to apply only that standard which the courts would ultimately deem to be proper. Nor do the facts establish any malicious intent toward the owner of the Parkchester complex. Indeed, the Attorney-General approved the filing for the conversion of the north quadrant, and successfully defended that approval from a tenant’s challenge in an article 78 proceeding.
One cannot deny that Parkchester was deprived of a timely determination of the acceptability of its offering plan. However, whatever equity supports application of the old law is more than counterbalanced by the remedial purposes underlying the new legislation. The 1974 amendment was designed to correct what the Legislature considered to be serious abuses associated with the conversion of rental units into condominiums. (Legislative Memorandum accompanying Bills Nos. S9090-B and A11196-B.) Indeed, the proposed conversion of the Parkchester Apartments typified the situation that the Legislature intended to correct. The Temporary State Commission on Living Costs and the Economy examined an alternative solution to the same problem. In its report of January 1974 to the Governor and the Legislature, the commission described the abuses that existed in marketing condominiums. It specified that "[t]he magnitude of the incentive to so market the property is exemplified by the financial arrangements surrounding Parkchester.” (Report on Housing and Rents of the Temporary State Commission on Living Costs and the Economy of the State of New York [1974], part VI, p 2.)
The Legislature responded to the problem by amending section 352-e of the General Business Law and directed that the amendments "take effect immediately”. (L 1974, ch 1021, *995 § 3.) The legislative history indicates an intent that the amendments apply to any conversion plan that had not yet been fully implemented, even if the Attorney-General had already accepted the plan for filing. (See Governor’s Official Bill Jacket to L 1974, ch 1021, at p 7.) In contrast, the present dispute involves the application of the statute to a conversion plan not yet accepted for filing and, thus, is even further removed from final implementation. Certainly the legislation’s remedial purpose extends to the prevention of abuses associated with conversion plans that are merely proposed and pending.
The principles of equity and fairness which control Parkchester’s claim for the application of a repealed statute can only be assessed in light of all relevant facts and circumstances. On the one hand, the postponement of decision by the Attorney-General is explained by an articulable and reasonable policy. The Attorney-General has been neither neglectful nor slothful; rather, his actions with respect to Parkchester indicate his desire that the tenants, as well as the landlord, receive the protections provided by law. On the other hand, the Legislature considered the prior law on condominium conversions to be unfair and inequitable, and found that conversions raised pressing and troublesome difficulties requiring immediate resolution. In the present context, I believe that the public interest, as determined by the Legislature, outweighs Parkchester’s claim that it should have the repealed law applied. In short, I place a greater value on the remedial efforts of the Legislature to protect tenants from abuses than on the technical arguments of a real estate syndicator, whose activities have been viewed by the Legislature as abusive. Consequently, I would reverse the order of the Appellate Division and dismiss the motion to amend the judgment.
Ordered affirmed, etc.